UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael Jackson, | ) | C/A No. 5:15-2994-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| Nancy A. Berryhill,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"),

denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties'

submissions and the applicable law, the court *affirms* the Commissioner's decision, as discussed

herein.

I.      Relevant Background

        A.      Procedural History

        Plaintiff applied for DIB and SSI in May 2011, pursuant to Titles II and XVI of the Act, 42

U.S.C. §§ 401-403, and 380-83, *et seq.*, alleging he became disabled on April 18, 2011. Tr. 212-

21. His applications were denied initially, Tr. 84-85, and upon reconsideration, Tr. 116-19.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 136-37, which was

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Nancy A. Berryhill for Carolyn W. Colvin as Defendant in this action.

held on January 14, 2014, Tr. 30-65, after Plaintiff requested and received a postponement of the previously scheduled hearing, Tr. 164-65. In a decision dated February 21, 2014, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Tr. 12-23. Plaintiff requested review by the Appeals Council, Tr. 11, and the Appeals Council denied Plaintiff's request for review on July 15, 2015, making the ALJ's decision the final decision for purposes of judicial review, Tr. 1-4. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on July 30, 2015. ECF No. 1.

B.    Plaintiff's Background

Born in September 1962, Plaintiff was 48 years old on his alleged onset date of April 18, 2011. Tr. 243. In his Disability Report – Adult, Plaintiff indicated that he completed the 11th grade and did not attend special education classes.[2] Tr. 255-56. Plaintiff listed his past relevant work ("PRW") as a machine operator for a cannery company (Oct. 2000-April 2011) and for a textile company (1981-1999). Tr. 256. Plaintiff indicated that a stroke and clogged artery on the right side limited his ability to work, and he stopped working because of these conditions on April 18, 2011. Tr. 255. In a Disability Report – Appeal dated October 31, 2011, Plaintiff indicated that his condition was worse, he had constant neck pain and left-sided weakness, and he could not sleep. Tr. 284. Plaintiff indicated he had new illnesses, injuries, or conditions since his last disability report and listed the following: "Left-sided pain; depression; sleep disturbance; difficulties with remembering, concentrating, and comprehending; dizziness; off-balance on the left side; left-sided numbness (face and hand); no appetite." *Id.* In a subsequent Disability Report – Appeal dated May 3, 2012, Plaintiff indicated that he had "speech problems" and was told he had "stress around [his] heart." Tr. 298.

---

[2] At the administrative hearing Plaintiff testified that the highest grade he completed was the eighth grade. Tr. 38. School records indicate Plaintiff started the ninth grade for the 1979-80 school term but withdrew from school on February 5, 1980. Tr. 316.

Medical records indicate that on April 18, 2011, Plaintiff presented to the Chesterfield General Hospital Emergency Department for evaluation of numbness in his left wrist and hand and the left side of his face. Tr. 381. Plaintiff had not had chest pain, shortness of breath, headache, neck pain, shoulder pain, or other complaints. *Id.* A CT scan of Plaintiff's brain did not reveal an acute abnormality and Plaintiff was discharged with instructions to follow-up with his primary care physician and to take an aspirin every day. Tr. 383. Plaintiff was admitted into Carolinas Hospital System in Florence, S.C. on April 29, 2011, and discharged on May 5, 2011, on a regimen of Plavix and aspirin. Tr. 434. A brain MRI on April 29, 2011, revealed the following impressions: "1. The flow void in the right cavernous carotid is absent indicating occlusion. 2. Acute infarcts in the deep white matter in the right frontal and parietal brain. 3. Some mild white matter changes in the left hemisphere." Tr. 403. A consultation on that same date indicated Plaintiff had a stroke and he was given a transesophageal echocardiogram with negative results "for detection of intracardiac mass, thrombus, and shunt lesions." Tr. 413-15.

C.      The Administrative Proceedings

1.      Plaintiff's Testimony

Plaintiff appeared with his counsel for an administrative hearing on January 14, 2014. Tr. 30. In response to questions from the ALJ, Plaintiff confirmed that he was 51 years old, had no children, and lived with his wife in a mobile home. Tr. 36-37. Plaintiff testified that his wife is employed fulltime, and he does not have a current source of income. Tr. 37. Plaintiff stated that he has a driver's license but only drives once every six months to go to the doctor, which is about five miles from his home. Tr. 38. Plaintiff confirmed that the highest grade he completed in school was the eighth grade, he had no other vocational training, and he had not served in the military. *Id.* Plaintiff testified that he smoked "about a half a pack a day" and did not drink any alcohol. Tr. 39. Plaintiff stated that he has not worked since April 18, 2011, and has not collected any

unemployment since that date. *Id.* Plaintiff stated that he worked for Carolina Canners and for Piece Dye Acquisition Corporation ("Piece Dye") running a denim frame.[3] *Id.* After some discussion with the ALJ and VE regarding Plaintiff's duties at Piece Dye, Plaintiff confirmed the VE's understanding that Plaintiff's work was part of the finishing machine-tending operation. Tr. 41.

Plaintiff was shown his medication list at Exhibit 20E and confirmed that he no longer took the sinus medication but took all the medications listing on the first page of the exhibit.[4] Tr. 41-42. Plaintiff testified that he has run out of his medication two or three times since he has been taking it. Tr. 42. The ALJ indicated a notation in the record that on August 2, 2013, Plaintiff was out of his medication, and Plaintiff confirmed that was correct. Tr. 43. Plaintiff testified that when he is out of his medication he is without them for about a month. *Id.* Plaintiff stated that his medication runs out because he does not have insurance or money to buy it. *Id.* Plaintiff testified that his wife buys his cigarettes. *Id.*

Plaintiff testified that he gets up in the morning "about 7:55 a.m." around the time his wife leaves the house for work. Tr. 43-44. Plaintiff testified that he stays at home alone along with his 95-pound Labrador. Tr. 44. Plaintiff stated that he no longer walks the dog because the dog pulls him down. *Id.* Plaintiff testified that while his wife is at work he tries "to clean up a little bit until [he] get[s] tired." *Id.* Plaintiff stated that he vacuums, makes the bed, and sweeps the floor. *Id.* Plaintiff stated that he did not do any cooking, but he used the microwave and made sandwiches. Tr. 45. Plaintiff testified that his wife does the grocery shopping and other than going to the doctor

---

[3] The transcript incorrectly spells the name of the company as *Peace* Dye Acquisition Corporation; however, Plaintiff's work history report indicates the correct spelling is *Piece* Dye Acquisition Corporation. Tr. 238.

[4] The medications listed on Exhibit 20E include the following prescription medications: Lisinopril 20mg (first prescribed in Aug. 2013) and Atenolol 25mg (first prescribed in May 2011) for high blood pressure; Clopidogrel 75mg, a blood thinner; and Crestor 5mg for cholesterol (both first prescribed in May 2011). The exhibit also lists the following over-the-counter ("OTC") medications: aspirin, Beano, Gas-Ex, and Alka Seltzer Plus. Tr. 326.

he goes out to eat about once a month. *Id.* Plaintiff stated that he goes to bed at about 10:30. *Id.* Plaintiff testified that he can lift about 20 pounds, walk about a half a mile, stand for about an hour, and sit for about an hour. Tr. 45-46. Plaintiff stated that he feels he is unable to work because his "left side stay numb" from his head to his feet, and he has a clogged artery on the right side of his neck. Tr. 46.

In response to a question from his counsel, Plaintiff testified that he only drives once a month because he had an experience when he "was driving to the doctor and [his] left hand went numb and it snatched the steering wheel and [he] got in a wreck." Tr. 47. Plaintiff testified that he could read a newspaper but would have trouble explaining what he read. *Id.* Plaintiff stated he always had that problem, even when he was in school. *Id.* Plaintiff testified that when he was in school he took special education classes. Tr. 48. The ALJ interrupted and discussed with counsel that the record did not indicate Plaintiff was enrolled in special education classes. Counsel confirmed that the school records did not indicate special education classes, but that "he certainly had some problems, because he repeated the first grade[5] and he was socially promoted in the second grade. He didn't pass that either. . . . It looks like he passed the seventh and then spent two years in the eighth, so he was certainly having problems with school." *Id.* The ALJ referenced the notation in the consultative examination that reported Plaintiff completing the seventh grade and then quitting due to being expelled for fighting. Tr. 49. The ALJ noted the discrepancy between the report and what Plaintiff told the consultant. *Id.*

Counsel resumed questioning of Plaintiff and Plaintiff stated that since having a stroke in April of 2011 there has not been a time when he did not have numbness. Tr. 50. Plaintiff testified that because of the numbness it is hard to lift things, if he tries to clean house he gets tired "real fast," and his left leg goes to sleep. *Id.* Plaintiff clarified that he could vacuum or sweep for five-

---

[5] In a 2013 Psychological Consultation Plaintiff reported that he repeated the first grade because "he was frequently sick with whooping cough." Tr. 597-98.

to-ten minutes before getting tired and needing to rest for about 15 minutes. *Id.* Plaintiff stated that he did not sleep well at night and that he slept for a total of three-to-four hours. Tr. 51. Plaintiff testified that because he is tired from not sleeping at night he takes an hour-and-a-half nap every day. *Id.* Plaintiff testified that he is able to hold a small item in his left hand once he gets a good grip on it. *Id.* Plaintiff's counsel noted that Plaintiff was wearing a soft Velcro brace on his hand and Plaintiff stated that he wore it because his hand would "start tremoring" and he "put that on to calm it down." Tr. 51-52. Plaintiff testified that he could lift a 20-pound dumbbell in his left hand only if he also used his right hand. Tr. 52. Plaintiff testified that because of his left side numbness he is unable to walk more than a half mile, and walking a half mile takes him "a good 45 minutes." Tr. 53. Plaintiff testified that since his stroke, if he gets up too quickly he will lose his balance. *Id.* As far as his personal care, Plaintiff testified that it is sometimes hard to hold a washcloth in his left hand, but he can tie his shoes and put on his socks and he can "barely" fasten buttons and zippers. Tr. 53-54. In addition to the left side numbness Plaintiff testified that he has headaches twice a week. Tr. 54. Plaintiff stated that to relieve the headaches he takes two aspirin and lies down for two hours. *Id.* Plaintiff stated that when his blood pressure is up he feels light-headed and that he feels that way "all the time." Tr. 55. Plaintiff stated that his doctor wants to run more tests on him but he has not done the tests because of lack of insurance and money. *Id.* Plaintiff testified that his wife has always been the one to keep up with the bills and checking account. Tr. 56. Plaintiff testified that while he is at home during the day, when he is not trying to do house work, he will "just sit around and relax." *Id.* Plaintiff stated that he watches TV but after an hour his mind slips and he forgets what he is watching. *Id.* Plaintiff stated that he has problems remembering things. Tr. 57.

2.    VE's Testimony

VE William Stewart[6] also testified at the hearing. The VE characterized Plaintiff's past work at the cannery company as a forklift driver or forklift operator as medium, with a specific vocational preparation ("SVP") of 3, "which is the beginning level of semi-skilled work[,]" with a representative Dictionary of Occupational Titles ("DOT") number 921.683-050, which "also cross references in the DOT under industrial truck driver." Tr. 59. The VE described Plaintiff's work in the textile company as "a rolling machine operator as part of this finishing process." *Id.* The VE described the work as medium, SVP of 2, "which is unskilled work[,]" and a representative DOT number 585.685-078. *Id.* The VE confirmed that both jobs were performed at the medium level, but as described by the worker the textile job could have overlapped into a heavy category. Tr. 59-60. The VE testified that the forklift job, although it had an SVP of 3, did not generate skills transferable to skilled or semi-skilled work. Tr. 60.

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, past work experience, and impairments status post CVA [cerebrovascular accident] with the following limitations:

> [L]ift and/or carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk about six hours in an eight hour work day, sit about six hours in an eight hour work day, never climbing ladders, ropes, scaffolds. Frequently climbing ramps, stairs, balancing, stooping, kneeling, crouching, crawling. Left upper extremity, handling, fingering, feeling. Limited to frequent with unlimited assistive use of the right upper extremity. Limited to unskilled work based on work history and educational attainment.

Tr. 60-61. The ALJ asked if the hypothetical individual would be able to perform Plaintiff's past work and the VE responded that "both of the past jobs would be ruled out." Tr. 61. The VE stated that the hypothetical individual would be able to perform light unskilled work and identified the

---

[6] The transcript spells the VE's surname as "Stuart." However, the correct spelling is "Stewart," as set forth in the VE's curriculum vitae. Tr. 196.

following jobs as examples: packer, DOT number 920.682-166, light, SVP of 2, regionally 2,800 jobs, nationally 65,000 to 80,000 jobs; and machine tender, DOT number 649.686-022, light, SVP of 1, unskilled, regionally 1,300 jobs, and nationally 54,000 jobs. Tr. 61-62.

In his second hypothetical the ALJ asked the VE to assume the same vocational factors and impairments as in the first hypothetical but with the following limitations:

> [L]ift and/or carry 10 pounds occasionally, less than 10 pounds frequently, stand and/or walk at least two hours in an eight hour work day, sit for about six hours in an eight hour workday, never climbing ladders, ropes, scaffolds, frequently climbing ramps, stairs, balancing, stooping, kneeling, crouching, crawling. Left upper extremity handling, fingering, feeling. Limited to frequent with unlimited assistive use of right upper extremity. Unskilled work based on work history and educational attainment.

Tr. 62. The ALJ asked if the person would be able to perform Plaintiff's past work and the VE responded in the negative. *Id.* When asked if there was other work in the local or national economy the individual could perform the VE responded that there would be unskilled sedentary jobs available. *Id.* The VE identified the jobs of machine tender or operator, DOT number 781.682-010, sedentary, SVP of 2, 1,400 regionally, and 51,000 nationally; and table worker, DOT number 739.687-182, sedentary, SVP of 2, 3,600 regionally, and 110,000 nationally. Tr. 62-63. The ALJ posed a third hypothetical of an individual with the same vocational factors and impairments as in hypothetical number one, "except that individual is limited as stated in claimant's testimony, concerning all testimony to be credible." Tr. 63. The VE testified that the individual would be unable to perform Plaintiff's past work. *Id.* The VE testified that the individual could perform work that was available in the local or national economy but would not be "productive on a reliable and a sustained basis based on limitations that frequent and that severe." *Id.*

Plaintiff's counsel asked the VE to clarify from the last hypothetical what part of Plaintiff's testimony would make him unreliable. Tr. 64. The VE responded that it referred to

Plaintiff's inability to maintain stamina, the issues of his left hand and left numbness problems, and "basically, not being able to do sustained activities." *Id.*

D.    The ALJ's Findings

In her February 21, 2014 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since April 18, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairment: status post cerebrovascular accident (CVA) (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with no climbing of ropes, ladders, or scaffolds; frequent climbing of ramps and stairs, balancing, stooping, crouching, and crawling; and frequent handling, fingering, and feeling with the left upper extremity with unlimited assistive use of the right upper extremity. The claimant is further limited to unskilled work activity based on his work history and education.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on September 6, 1962 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 18, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 17-23.

II.    Discussion

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings; (4) whether such impairment prevents claimant from performing past relevant work ("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's

disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S.

389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff's allegations of error as summed up in the "Conclusion" section of his brief are that the ALJ (1) erred in finding that Plaintiff retained the residual functional capacity ("RFC") for light work; (2) violated the requirements of SSR 96-8p in assessing Plaintiff's RFC by not doing a function-by-function analysis of Plaintiff's work-related abilities; (3) failed to follow the slight abnormality standard of SSR 96-3p in evaluating Plaintiff's impairments; (4) ignored the impact of Plaintiff's full-scale IQ of 62 and erred in not finding that he met listing 12.05(C); (5) erred in determining Plaintiff can perform sustained work activities under SSR 96-8p; and (6) posed inaccurate hypothetical questions to the VE and therefore failed to meet the Commissioner's burden at Step Five of the sequential evaluation process. Pl.'s Br. 25-26, ECF No. 15.

1.    ALJ's Determination of Plaintiff's RFC

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*. *Id.* (emphasis in original). At the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. §§ 404.1545(a)(3) and (4), 416.945(a)(3) and (4).

Here, the ALJ determined that Plaintiff has the RFC to perform light, unskilled work with postural limitations of "no climbing of ropes, ladders, or scaffolds; frequent climbing of ramps and stairs, balancing, stooping, crouching, and crawling; and frequent handling, fingering, and feeling with the left upper extremity with unlimited assistive use of the right upper extremity." Tr. 19.

a.    Function-by-Function Analysis

Plaintiff asserts that although the ALJ found she had the severe impairment of status post CVA, "she erred in failing to identify what limitations the Plaintiff actually has from this severe impairment." Pl.'s Br. 17. The Commissioner contends that "the ALJ's discussion of Plaintiff's examination findings and treatment notes, subjective statements, and opinion evidence coupled with her finding that Plaintiff could perform a reduced range of light work, satisfies the mandate of SSR 96-8p. Def.'s Br. 25, ECF No. 16.

The Administration's policy interpretation on assessing an individual's RFC emphasizes that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be

expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1. The functions identified in the cited regulation include: physical abilities, mental abilities, and other abilities affected by impairments. 20 C.F.R. §§404.1545(b)-(d), 416.945(b)-(d). In *Mascio v. Colvin*, 780 F.3d 632, 636-37 (4th Cir. 2015), the Fourth Circuit addressed whether an ALJ's failure to perform a function-by-function assessment necessitates remand. The court held that "a per se rule [requiring remand] is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" *Id.* at 636. However, the court "agree[d] with the Second Circuit that '[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Id.*

Here, at Steps Two and Three of the sequential evaluation process, the ALJ identified Plaintiff's impairment (status post CVA), considered his symptoms, examination results from May 2011 through February 2013, and discussed Plaintiff's physical and mental abilities. Tr. 17-19. The ALJ described Plaintiff's symptoms and impairments, both as testified to by Plaintiff and as described in the medical records, and discussed their impact on Plaintiff's daily activities and his occupational functioning. For example, the ALJ recounted the following:

- In September 2011, Dr. Pravin Patel performed a consultative physical evaluation of Plaintiff. Plaintiff reported continued left sided weakness, blurred vision, and aching sensations in the neck. The examination revealed a full range of motion of the spine, full strength, and a normal gait. Dr. Patel's impression was right CVA with left monoparesis without any residual deficits.

- Also in September 2011, Plaintiff's treating physician, Dr. Healy, noted Plaintiff had a very mild decrease in fine motor skills and sensation of the left hand.

- In October 2011, Dr. Healy noted Plaintiff was unable to perform repetitive alternating neck movements.

- In December 2011, Dr. Healy reported that Plaintiff had no mental diagnosis and no

work limitations.

- A March 2012 consultative physical evaluation by Dr. Harriet Steinert revealed mild weakness of the left upper extremity and decreased sensation to light touch to the left side of Plaintiff's face. Dr. Steinert noted there were no other limitations or abnormalities although Plaintiff reported headaches and blurred vision. His vision was 20/30 without glasses.

- Dr. Kelly performed a consultative psychological evaluation of Plaintiff in March 2012 and diagnosed him with mood disorder. The evaluation concluded Plaintiff had no limitations in social interaction and his activities of daily living were not affected by any mental limitations. Plaintiff reported that he was in regular classes in school and was an average student, but after being expelled for fighting in the 7th grade he opted not to return to school. Dr. Kelly noted that Plaintiff appeared to be functioning in the low average range of intelligence with good memory.

- A February 2013 treatment note indicated Plaintiff was neurologically stable.

- Plaintiff underwent a psychological evaluation in February 2013 and was diagnosed with adjustment disorder with depressed mood, rated with a GAF score of 65 indicating mild symptoms but generally functioning well. Plaintiff reported left-sided weakness and slurred speech, neither of which was noted on examination. Plaintiff's mental status examination was fully normal.

- In February 2013 Plaintiff had a gastroenterology evaluation for his complaints regarding chronic gas and bloating but his physical examination was negative, including normal ambulation.

Tr. 17-18. In determining that Plaintiff did not have an impairment or combination of impairments that meets or medically equals a listing, the ALJ noted that no State agency expert or treating provider had credibly concluded that Plaintiff had an impairment severe enough to meet a listing. Tr. 19. After making these observations, the ALJ found that Plaintiff had the RFC to perform light work with certain limitations. *Id.* The ALJ's analysis of the evidence provides a logical bridge between the evidence and his RFC findings. *See Bennett v. Astrue*, No. 1:10-CV-1931-RMG, 2011 WL 2470070, at *3 (finding the ALJ's RFC assessment consistent with the regulations). The ALJ's review of the record evidence demonstrates that she assessed Plaintiff's functionality—both physically and mentally. Therefore, the court finds that the ALJ did not fail to assess Plaintiff's capacity to perform relevant functions to such an extent that it would require remand.

b.  Slight Abnormality Standard

Plaintiff contends the ALJ "erred in failing to follow the 'slight abnormality' standard in finding that the Plaintiff's memory loss, low IQ (which was actually a Full Scale IQ of 62), blurry vision, and headaches are non-severe." Pl.'s Br. 18. The Commissioner argues that "although Plaintiff was diagnosed with a number of conditions, none of them resulted in any functional limitations resulting in an inability to perform work activities." Def.'s Br. 18.

Under SSR 96–3p, an impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1.  The Ruling also states that "an impairment that is 'not severe' must be a slight abnormality (or combination of slight abnormalities) that has no more than minimal effect on the ability to do basic work activities." *Id.* The regulations define basic work activities to include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

Here, at Step Two, the ALJ determined that "claimant's medically determinable impairments of memory loss, low IQ, blurry vision, and headaches are not shown by the medical evidence to have more than a minimal effect on the claimant's functioning and are therefore non-severe." Tr. 19. Plaintiff argues that his memory loss "could potentially impact the Plaintiff's ability to remember, carry out, persist, and adequately complete work tasks" and his low IQ "falls into the area of mental retardation" and has to be evaluated under the Listings. Pl.'s Br. 18. Plaintiff does not address how his blurry vision or headaches impact his ability to do basic work activities.

16

The court finds no error in the ALJ's treatment of these impairments. The ALJ properly considered the impairments noting Plaintiff's history of hypertension, reports of blurred vision (although his vision was 20/30 without glasses) and headaches. Tr. 18. The ALJ also noted Dr. Healy reported "no mental diagnosis and no work limitations," and Dr. Kelly reported that Plaintiff "appeared to be functioning in the low average range of intelligence with good memory." *Id.* In discussing the medical evidence in her RFC analysis the ALJ noted that "claimant has few complaints of headache in the record and he testified that he takes two over the counter aspirin to relieve this pain. Therefore, the undersigned finds that the claimant's headaches are not severe." Tr. 20. The ALJ notes again that Drs. Healy, Kelly, and Windsorova determined Plaintiff had no mental limitations. *Id.* The ALJ found Plaintiff's low IQ score was not credible and not supported by the medical evidence given his "long work history and no evidence of deficits in adaptive functioning."[7] Tr. 21.

Plaintiff also contends the ALJ "did not make any determination regarding the Plaintiff's cervical spondylosis with myelopathy with resulting neck pain, hypertension, adjustment disorder with depressed mood, mood disorder due to general medical condition, and difficulties with concentration and comprehension." Pl.'s Br. 20. As indicated above, the ALJ addressed these impairments in her decision and also noted objective medical evidence related to Plaintiff's cervical spondylosis including January 2012 x-rays of Plaintiff's cervical spine and a September 2012 MRI of Plaintiff's cervical spine. Tr. 18. Both indicated changes at C5-7 and the x-ray showed "no significant encroachment of the canal/foramina, and no other abnormalities."[8] *Id.* The ALJ noted that Plaintiff had a "normal nerve conduction study" in October 2012, and Dr. Healy

---

[7] The issue of Plaintiff's IQ and Listing 12.05C are discussed below.

[8] The full report from the MRI states: "Cranial cervical junction is normal. Vertebral bodies are normal. Intervertebral disc spaces are fairly well maintained. There is anterior and posterior spondylitic changes at C5-6 and 6-7. The neuroforamen appear to be patent. Cord signal normal." Tr. 593.

found Plaintiff to be "neurologically stable on February 12, 2013." *Id.* (citing ex. 17F). In making her RFC determination the ALJ noted that Plaintiff "does have objective findings of cervical disc disease, and this impairment was considered in the residual functional capacity assessment. Interestingly, the claimant did not complain of neck pain or limitations related to this impairment." Tr. 20. The court finds that the ALJ did not err in failing to identify cervical spondylosis as a severe impairment where the record suggested it was a slight abnormality that had little or no effect on Plaintiff's ability to do basic work activities. *See* SSR 96–3p; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a).

Even if the ALJ had erred in her Step Two analysis, that error would be harmless because finding a severe impairment at Step Two ensured she would proceed to Step Three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that "any error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). This court has found no reversible error in situations in which the ALJ neglected to find an impairment to be severe at Step Two when the ALJ considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009). Here, the ALJ found Plaintiff had the severe impairment of status post cerebrovascular accident and proceeded to the next step of the sequential evaluation process. Accordingly, any allegation of error in this regard is harmless.

### c. Capacity for Light Work

Plaintiff alleges the ALJ erred in finding that he can perform the physical demands of light work because the RFC assessment is not supported by substantial evidence. Pl.'s Br. 20. The Commissioner argues that "the ALJ properly accounted for all of Plaintiff's credibly-established

functional limitations in the RFC assessment when she limited Plaintiff to performing unskilled light work that required no climbing of ropes, ladders, or scaffolds; frequent climbing of ramps and stairs, balancing, stooping, crouching, and crawling; and frequent handling, fingering, and feeling with the left upper extremity with unlimited assistive use of the right upper extremity (Tr. 19)." Def.'s Br. 28.

Here, the ALJ determined that Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)" with several limitations as noted above. Tr. 19. SSR 83-10 clarifies the definition provided in the regulations for light level work:

> The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.
>
> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

SSR 83-10, 1983 WL 31251, at *5-6.

Plaintiff contends that he would be unable to perform the standing and walking required of light work, and his inability to grasp and hold objects during the day would further preclude his ability to perform light work. Pl.'s Br. 21. In support of this assertion Plaintiff cites to the consultative examination of Dr. Harriett Steinert and notes that Dr. Steinert found his left upper

and left lower extremity "much weaker than the right side" and that Plaintiff had "difficulty holding onto objects and doing buttons with the left hand." *Id.* This observation is not completely accurate. In her examination notes Dr. Steinert indicated:

> The left upper extremity and lower extremity are *slightly weaker* than the right one (4/5). There is no muscle atrophy. Grip strength is normal in his right hand (5/5) and decreased in the left one (3/5). There are normal and equal fine motor and gross motor skills in his right hand, but he has *some* difficulty holding on to *large* objects and with buttons with the left one. . . . The patient is able to walk across the room without an assist device with a normal gait. The patient can walk on his toes and heels.

Tr. 472 (emphasis added).

An ALJ determines a claimant's RFC by considering how the claimant's impairments may cause physical and mental limitations that affect the person's ability to work. 20 C.F.R. §§ 404.1545(a), 416.945. Here, in addition to her consideration of Plaintiff's testimony and the objective medical evidence, the ALJ considered the medical opinion evidence. The ALJ gave "great weight" to Dr. Steinert's opinion and incorporated her findings into the RFC assessment. Tr. 21. The ALJ recounted Plaintiff's testimony from the administrative hearing regarding his limitations, considered it in light of the medical evidence of record, and found as follows:

> In terms of the claimant's alleged limitations, his testimony is not credible. The medical record establishes that just four months after his stroke, in September, the claimant had no physical limitations (Exhibit 5F). Dr. Healy noted that the claimant only had a very mild decrease in fine motor skills and sensation in the left hand (Exhibit 17F).[9] In December of 2011, Dr. Healy noted that the claimant had no mental limitations and no mental diagnosis (Exhibit 7F). In March of 2012, the claimant was again found to have no limitations, with the exception of mild weakness and decreased sensation of the left upper extremity (Exhibit 10F). The claimant's ambulation was described as normal in February 2013 (Exhibit 19F) and there is no treatment note that asserts an abnormality in gait. Therefore, the claimant's testimony of left sided weakness and numbness is not credible to the debilitating extent alleged.

---

[9] This exhibit citation is incorrect. This observation was noted in Dr. Healy's Office Note dated September 19, 2011 at Exhibit 6F. Tr. 444.

Tr. 20. The ALJ concluded that the RFC assessment "is supported by the objective medical evidence of record and the consultative examination findings." Tr. 21. In her RFC assessment the ALJ found that Plaintiff's ability to perform the full range of light work was impeded by additional limitations. The ALJ consulted the VE about jobs that Plaintiff could perform given those limitations and the VE identified the two jobs of packer and machine tender. Tr. 22. The ALJ concluded that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 22-23. The court finds that substantial evidence supports a finding that the ALJ considered Plaintiff's impairments and limitations and properly determined that Plaintiff was able to perform a limited range of light work.

### d.  Sustained Work Activities

Plaintiff also argues that "the evidence of record fails to support that the Plaintiff can perform sustained work activities." Pl.'s Br. 24. Plaintiff asserts that the VE confirmed that his inability to do sustained activities would not be consistent with reliable work activity and the VE's testimony "would mean that the Plaintiff would not meet the definition of working on a 'regular and continuing basis' as defined in SSR 96-8p." *Id.*

SSR 96-8p provides:

> Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*.

SSR 96-8p, 1996 WL 374184, at *2 (footnotes omitted, emphasis in original). "Thus, the RFC is, by definition, an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Beckham v. Colvin*, No. CIV.A. 8:13-2774-BHH, 2015 WL 733785, at *11 (D.S.C. Feb. 20, 2015). "The Fourth Circuit Court of Appeals has explained that RFC determinations may contain implicit findings, including

a finding of the ability to work on a regular and continuing basis." *Id.* (citing *Hines v. Barnhart,* 453 F.3d 559, 563 (4th Cir. 2006) ("In light of SSR 96–8p, [the ALJ's] conclusion [that plaintiff could perform a range of sedentary work] implicitly contained a finding that [plaintiff] physically is able to work an eight hour day.")).

The ALJ's third hypothetical posed to the VE asked the VE to assume that the hypothetical individual "is limited as stated in claimant's testimony, concerning all testimony to be credible." Tr. 63. The VE testified that such an individual could perform work available in the local or national economy but he did not "think the individual would be able to be productive on a reliable and a sustained basis based on limitations that frequent and that severe." *Id.*

It is a claimant's burden to present evidence of his disability. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 20 C.F.R. §§ 404.1512(a), 416.912(a) (generally setting forth a claimant's burden to produce evidence of a disabling impairment and the Agency's right to deny a claim for lack of evidence); *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). At the administrative hearing the ALJ used a VE to opine on jobs Plaintiff could perform given his vocational profile. However, the ALJ was not obligated to accept or rely on all of the VE's responses.

> The RFC, and by extension, any hypothetical question relied upon, need only reflect those limitations that are credibly established by the record. *See Russell v. Barnhart,* 58 Fed. Appx. 25, 30 (4th Cir. Feb. 7, 2003) (citing *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987); *Youkers v. Colvin,* 2014 WL 906484, at *11 (S.D.W.Va. Mar. 7, 2014); *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005) (holding that hypotheticals to VEs need not credit every symptom alleged by the claimant, only those that are "medically established"); *Jones v. Barnhart,* 364 F.3d 501, 506-07 (3d Cir. 2004) (holding that, while ALJs may pose multiple hypotheticals, they need only credit those that are consistent with the evidence of record). The ALJ is not required to adopt VE testimony in response to limitations that are not supported by the record. *Youkers,* 2014 WL 906484 at *11. *See also Parker v. Colvin,* 2013 WL 4748409 (W.D.N.C. Sept. 4, 2013) ("[T]he fact that the Vocational Expert ("VE") responded to a hypothetical posed . . . which was not consistent with the ALJ's RFC determination is of no consequence.").

22

*Baker v. Colvin*, No. 3:13-CV-20376, 2015 WL 5687544, at *9 (S.D.W. Va. Sept. 8, 2015), *report and recommendation adopted,* No. CV 3:13-20376, 2015 WL 5698511 (S.D.W. Va. Sept. 28, 2015).

In her decision, the ALJ properly weighed the medical evidence and specifically cited Plaintiff's limitations. The ALJ determined the evidence did not support Plaintiff's alleged limitations. The ALJ accounted for all of Plaintiff's credible limitations in her RFC assessment and found Plaintiff could not perform his PRW, but the VE identified jobs that a person with his vocational profile could perform. Tr. 21-22. *Mickles v. Shalala,* 29 F.3d 918, 929 n.7 (4th Cir. 1994) (concluding that the hypothetical presented to the VE need only include the impairments and limitations that the ALJ finds credible).

In *Tanner v. Commissioner of Social Security,* the Fourth Circuit Court of Appeals declined to uphold the plaintiff's argument "that the agency did not meet its burden of proof regarding her ability to perform alternative work, because the vocational expert concluded that, given her functional limitations, there were no jobs that she could perform." 602 F. App'x 95, 101 (4th Cir. 2015) (per curiam). The court noted that the plaintiff's contention "overlooks the circumstance that the vocational expert only reached that conclusion upon questioning from her counsel, and that her counsel posed hypothetical questions that included severe functional limitations not supported by the medical evidence. Indeed, when the ALJ posed hypotheticals to the VE that set out all of [the claimant's] credible limitations, the VE responded that [the claimant] could perform the jobs of packer, assembler, marker pricer, sorter, and inspector." *Id.* Here, the ALJ determined that based on the record and the VE's testimony, Plaintiff was capable of performing other work that existed in significant numbers in the national economy. Accordingly, the court finds that the ALJ's RFC encompasses the ability to perform light work on a sustained basis. Furthermore, the court finds that the ALJ's decision is supported by substantial evidence

and she did not err in declining to adopt the VE's response to the third hypothetical. *Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987) (holding that ALJ is not required to credit VE testimony elicited in response to hypothetical question that includes limitations that ALJ finds not to be credible).

### 2.    Plaintiff's Mental Impairment and Listing 12.05C

Plaintiff asserts that his "IQ score of 62 should have been considered as a severe impairment, and the Commissioner erred in not finding the Plaintiff disabled under Listing 12.05(C)." Pl.'s Br. 23. The Commissioner argues that "the ALJ appropriately considered the entirety of the evidence regarding Plaintiff's intellectual functioning, and reasonably determined that despite being assessed with a low IQ, Plaintiff had no functional limitations as a result of this purported condition (Tr. 17-19, 21)." Def.'s Br. 19.

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. §§ 404.1525(d), 416.925(d).

The introduction to Section 12.00 of the Listings clarifies how the structure for 12.05 differs from other mental disorder listings: "Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A). Listing 12.05 refers to intellectual disability[10] and states:

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

---

[10] Formerly defined as mental retardation.

developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

In *Hancock v. Astrue*, the Fourth Circuit held that the first prong of Listing 12.05 analysis "requires a showing of 'deficits in adaptive functioning initially manifested during the developmental period.'" *Hancock*, 667 F.3d 470, 473 (4th Cir. 2012). The second prong "requires the satisfaction of one of four additional requirements." *Id.* The court held that "even if the ALJ's finding concerning Prong 2 of Listing 12.05C did not rest on substantial evidence, we would still be required to affirm the ALJ's decision if his finding with regard to Prong 1 was based on substantial evidence." *Id.* at 475.

On February 18, 2013, licensed clinical psychologist Dora Windsorova, Ph.D., completed a Psychological Consultation of Plaintiff "for evaluation of his intellectual and academic abilities to assist in his application for disability." Tr. 597. Plaintiff reported that "he was a C average student though also having D's and a couple of F's. He never attended special education classes." Tr. 598. Dr. Windsorova tested Plaintiff using the Wechsler Adult Intelligence Scale-IV (WAIS-IV). Tr. 599. Plaintiff obtained a Full Scale IQ score of 62 placing "his overall level of intellectual abilities within the Extremely Low range and at the 1st percentile when compared to same-age peers." *Id.* Dr. Windsorova also administered the Wide Range Achievement Test-4 (WRAT-4) and Plaintiff scored a grade equivalent of 3.4 for Word Reading, 3.5 for Spelling, and 2.9 for Math Computation. *Id.* Dr. Windsorova noted the results "indicate him to be marginally literate having very low basic academic skills. These results reflect long-term low level of academic abilities

without any significant decline." Tr. 600. She noted that Plaintiff's "level of adaptive functioning is believed to be slightly above his current IQ considering [Plaintiff] always functioned in a low skilled competitive employment, being independent for all activities of daily living except for some assistance with financial management provided by his wife, and having long term stable relationship." *Id.*

Here, the ALJ found that Plaintiff's "alleged low IQ score of 62 is not found credible and is not supported by the medical evidence." Tr. 21. The ALJ noted that Plaintiff was in regular classes in school, he reported to the consultative examiner that he was an average student, and there were no school records suggesting that he was in special education. *Id.* The ALJ determined that the "IQ score of 62 cannot be given any weight. The claimant has a long work history and no evidence of deficits in adaptive functioning." *Id.*

a.   Plaintiff's IQ

Although Plaintiff argues that the ALJ "erroneously ignores the Plaintiff's Full Scale IQ of 62," Pl.'s Br. 22, this circuit permits an ALJ to reject an IQ score even when it is the only such score in the record. Further, many courts have approved of an ALJ's reliance on evidence of previous work as a basis for discrediting IQ scores. *Hancock*, 667 F.3d at 474 ("[A]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record."); *see Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) ("[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior."); *Muse v. Sullivan*, 925 F.2d 785, 789-90 (5th Cir. 1991) (scores inconsistent with job history, past medical records, and showing of good memory). Under *Hancock*, an ALJ may discredit IQ scores based on "other evidence contradicting them." *Id.* at 475. This holding is in accord with that of other federal courts that have addressed this issue. *See Lax v. Astrue*, 489 F.3d 1080, 1086-87 (10th Cir. 2007)

(scores not accurate reflection of intellectual capabilities in light of other evidence); *Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003) (scores inconsistent with ability to care for oneself and perform activities of daily living); *Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998) (scores derived from "first and only meeting" with examiner and were inconsistent with record of functional ability and prior medical record); *Muse v. Sullivan*, 925 F.2d at 789-90 (scores inconsistent with job history, past medical records, and showing of good memory); *Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (scores inconsistent with academic achievement; claimant trying to appear unfavorable).

Here, the ALJ reasonably discredited the 2013 IQ score based on contradictory evidence in the record. *See Hancock*, 667 F.3d at 475 ("[I]n discrediting the IQ scores, the ALJ relied on . . . inconsistency with both the claimant's actual functioning and with the notes of treating psychiatrists."); *see also Sechrist v. Colvin*, No. 4:13-CV-167-D, 2014 WL 4162384, at *7 (E.D.N.C. July 31, 2014) (substantial evidence supported finding that Listing 12.05 not met despite "mild mental retardation" diagnosis where ALJ relied on claimant's activities of daily living "maintaining a driver's license, playing with his child, shopping, and performing housework" and past "semi-skilled" employment); *King v. Colvin*, No. 6:13-CV-02101-DCN 2015 WL 1313085, at *2 (D.S.C. Mar. 24, 2015) (adopting recommended finding of inapplicability of Listing 12.05 where ALJ discounted IQ scores based on presence of evidence showing minimal deficits in adaptive functioning including previous work experience and significant daily activities); *Weatherford v. Colvin*, No. 6:13-1885-RMG, 2014 WL 3881056, *9-11 (D.S.C. Aug. 5, 2014) (same). Review of the record discloses substantial evidence to support the ALJ's finding. For example, Plaintiff informed the doctor who performed his IQ test in 2013 that he "never attended special education classes" while in school, Tr. 598, and Plaintiff responded to a question on his Disability Report – Adult form that he did not attend special education classes while in

school, Tr. 256. Plaintiff reported to Dr. Windsorova that he is capable of taking care of his personal needs and is able to perform activities such as caring for his dog, doing the dishes, and doing simple clean up. Tr. 598.

As previously noted, it is settled in this Circuit that an ALJ can disregard the only available IQ scores in the face of substantial contradictory evidence in the record and that it is the Plaintiff's burden, not the Commissioner's burden, to prove that a Listing is applicable in a disability claim. *See Hancock*; 667 F.3d at 476; *see also Sullivan v. Zebley*, 493 U.S. at 530-31. The court finds that the ALJ's decision not to give the 2013 IQ score weight is fully supported by substantial evidence in the record.

### b.  Deficits in Adaptive Functioning

Plaintiff contends that his long work history and no evidence of deficits in adaptive functioning "are not adequate rationales for excluding, invalidating, or overlooking Plaintiff's IQ of 62." Pl.'s Br. 22. The Commissioner argues "the ALJ correctly determined that Plaintiff's purported low IQ did not limit any basic work activities nor did it result in any deficits in adaptive functioning . . . ." Def.'s Br. 20, n.3.

In order to satisfy the first prong of Listing 12.05, a claimant must show "deficits in adaptive functioning initially manifested during the developmental period." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05; *Hancock*, 667 F.3d at 473. The Fourth Circuit has provided instruction on the factors that determine deficits in adaptive functioning noting the deficits "can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)).

Citing to his school records which reflect he had few passing grades, and to his need for his wife to handle his financial affairs, Plaintiff asserts that "it would be reversible error not to infer that the Plaintiff's mental retardation began before age 22." Pl.'s Br. 23. The ALJ noted that Plaintiff "has a long work history and no evidence of deficits in adaptive functioning." Tr. 21. At Step Two the ALJ discussed Plaintiff's medical records when making her finding regarding severe impairments. The ALJ noted a 2012 consultative psychological evaluation by Dr. Kelly that noted Plaintiff "had no limitations in social interaction and his activities of daily living were not affected by any mental limitations." Tr. 18. The ALJ also noted Dr. Windsorova's 2013 psychological evaluation that discussed the daily activities Plaintiff is capable of performing. *Id.* At Step Three the ALJ noted that no State agency expert or treating provider has concluded that Plaintiff had an impairment severe enough to meet a listing. Tr. 19. The court notes that Plaintiff indicated that he was not disabled prior to age 22 in his SSI application. Tr. 212.

While it is true that work history alone cannot preclude benefits where the Listing 12.05C criteria are otherwise met, *see Luckey v. U. S. Dep't HHS*, 890 F.2d 666, 669 (4th Cir. 1989), both the Fourth Circuit and this court have held that it can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *Hancock*, 667 F.3d at 475-76 (concluding that the ALJ's finding that the claimant did not manifest requisite deficits in adaptive functioning was supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); *Parks v. Colvin*, No. 5:13-868-BHH-KDW, 2014 WL 4199055, at *12-13 (D.S.C. Aug. 20, 2014) (work history properly used to support finding of no deficits in adaptive function); *Harts v. Astrue*, No. 0:10-1893-CMC-PJG, 2012 WL 529982, at *6 n.3 (Jan. 30, 2012) (distinguishing *Luckey* because the ALJ used the claimant's work history as only one factor to support his finding of no significant deficits in adaptive functioning) *adopted*, 2012 WL 529980 (D.S.C. Feb. 17, 2012).

The court finds that the ALJ's rationale for finding Plaintiff does not meet the listing for intellectual disability based on lack of significant limitations in adaptive functioning is supported by substantial evidence. Accordingly, even if the court were to determine that the ALJ's decision regarding Plaintiff's IQ was not based on substantial evidence, Plaintiff's failure to meet the first prong of the Listing will still preclude him from a finding that he met the requirements of Listing 12.05. The court finds that the ALJ's findings regarding Listing 12.05C are legally sound and supported by substantial evidence and do not present reversible error.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig*, 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, it is hereby ORDERED that the Commissioner's decision be affirmed.

IT IS SO ORDERED.

February 14, 2017                                Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge